UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION


LINDA K. HAGEMAN,                    )
                                     )
              Plaintiff,             )
                                     )
       v.                            )        No.  2:13CV79 NCC
                                     )
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                     )
              Defendant.             )


## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Linda K. Hageman's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§

401, *et seq.*  All matters are pending before the undersigned United States

Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

Because the Commissioner's final decision is supported by substantial evidence on

the record as a whole, it is affirmed.

## I.  Procedural History

Plaintiff Linda K. Hageman applied for disability insurance benefits (DIB)

on November 18, 2008, claiming that she became disabled on August 6, 2008,

because of back pain, breathing problems, leg and ankle pain, depression, and

anxiety.  (Tr. 293-99, 359.)[1]  On January 8, 2009, the Social Security

Administration (SSA) denied plaintiff's claim for benefits.  (Tr. 148, 169-73.)

Upon plaintiff's request, a hearing was held before an administrative law judge

(ALJ) on September 23, 2009, at which plaintiff and a vocational expert testified.

(Tr. 91-119.)  On September 24, 2009, the ALJ issued a decision denying

plaintiff's claim for benefits, finding plaintiff able to perform her past relevant

work as a candle maker and machine operator.  (Tr. 149-58.)  On April 7, 2011, the

Appeals Council remanded the matter to an ALJ with instruction to evaluate the

treating source's opinion in accordance with the Regulations; further consider and

explain plaintiff's maximum residual functional capacity (RFC); further evaluate

plaintiff's ability to perform her past relevant work; and obtain supplemental

evidence from a vocational expert if necessary.  The ALJ was also instructed to

consider plaintiff's claim for benefits in combination with a subsequent application

for benefits that had been filed by plaintiff in March 2010.  (Tr. 162-64.)[2]

Upon remand, a hearing was held before an ALJ on October 18, 2011, at

which plaintiff and a vocational expert testified.  (Tr. 47-90.)  A supplemental

---

[1] Plaintiff also filed an application for supplemental security income (SSI), but that application was denied and not processed further because the agency determined that plaintiff's nonexcludable resources exceeded Title XVI's limitations.  (Tr. 300-02, 338.)

[2] Plaintiff filed a subsequent application for SSI on March 15, 2010 (Tr. 321-28), and for DIB on May 17, 2010 (Tr. 329-30).  As with plaintiff's first application for SSI, this subsequent application was denied and not processed further because the agency determined that plaintiff's nonexcludable resources exceeded Title XVI's limitations.  (Tr. 337.)

hearing was held on February 8, 2012, relating to plaintiff's request to cross-examine a consulting physician.  (Tr. 27-46.)  On April 23, 2012, the ALJ issued a decision denying plaintiff's claim for benefits, finding plaintiff able to perform other work as it exists in significant numbers in the national economy.  (Tr. 11-20.)  On July 3, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 1-5.)  The ALJ's determination of April 23, 2012, thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ failed to develop the record by not permitting plaintiff to cross-examine the consulting physician in this case.  Plaintiff also contends that the ALJ failed to accord proper weight to the opinion of her treating physician, Dr. Beckert.  Plaintiff also claims that the RFC assessment failed to include limitations caused by her severe impairment of somatic dysfunction.  Finally, plaintiff claims that the ALJ failed to accord proper weight to third-party statements regarding their observations of plaintiff's functioning.  Plaintiff requests that the matter be reversed and remanded to the Commissioner for an award of benefits or for further proceedings.

Because the ALJ committed no legal error and substantial evidence on the record as a whole supports his decision, the Commissioner's final decision that

plaintiff was not disabled is affirmed.

## II.  Relevant Testimonial Evidence Before the ALJ

A.     <u>Hearing Held September 23, 2009</u>

At the administrative hearing on September 23, 2009, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was thirty-four years of age.  Plaintiff completed high school.  (Tr. 97.)

Plaintiff's Work History Report shows her to have worked as a dietary aide in a nursing home from January 2001 to February 2005.  From October 2005 to July 2006, plaintiff worked as a candle maker.  From September 2006 to July 2008, plaintiff worked as a cook at a restaurant.  From October 2007 to August 2008, plaintiff worked as a laborer at an auto parts manufacturer.  (Tr. 367.)

Plaintiff testified that she has severe pain constantly between the shoulder blades and in the lower back for which she takes Oxycodone two or three times a day.  Plaintiff testified that she also takes Flexeril.  Plaintiff testified that she experiences no side effects from her medications.  Plaintiff testified that her treating physician has advised that her pain is caused by being twisted or crooked. (Tr. 101-03, 109, 115-16.)

Plaintiff testified that she experiences headaches and associated nausea three or four times a week and that such headaches last three hours and sometimes days.

Plaintiff testified that she also experiences light sensitivity with these headaches and that she takes Oxycodone for them. (Tr. 108.)

Plaintiff testified that she has breathing problems as a residual effect of a collapsed lung and broken ribs she sustained from an automobile accident. (Tr. 103.)

Plaintiff testified that she also has anger issues for which she takes Xanax. Plaintiff testified that she sometimes does not want to be around people. Plaintiff testified that she has had anger issues her entire life and needed medication to "mellow [her] out." Plaintiff testified that she has not sought or received any psychiatric help. (Tr. 110-11.)

As to her exertional abilities, plaintiff testified that she can sit for thirty minutes before needing to stand or lie down, and can stand for thirty minutes before needing to sit or lie down. Plaintiff testified that she can walk about one block before needing to sit or lie down. Plaintiff testified that she can lift about five pounds. Plaintiff testified that she can bend and squat but cannot stoop. (Tr. 111-12.)

As to her daily activities, plaintiff testified that she tries to do as little as possible because of her back pain. Plaintiff testified that doing dishes, laundry, and other household chores "kills her back[.]" Plaintiff testified that she is able to do the chores but experiences pain while doing so, especially with stooping,

bending, and lifting. (Tr. 104.) Plaintiff testified that her husband helps with the chores, grocery shopping, and caring for their animals. Plaintiff testified that she works harder at home than she did as a candle maker. Plaintiff testified that she could probably perform her work as a candle maker but that she would need to take her pain medication. (Tr. 105-06.) Plaintiff testified that she sleeps throughout the day because she has little energy. Plaintiff testified that she occasionally stays in bed for three or four days. (Tr. 109-11.)

B.  Hearing Held on October 18, 2011

1.  *Plaintiff's Testimony*

At the hearing on October 18, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was thirty-six years of age. Plaintiff is married and has no children. (Tr. 53-54.)

Plaintiff testified that she left her last job in August 2008 because "it was too much on [her] back." (Tr. 60.) Plaintiff testified that she did not have insurance or Medicaid assistance at that time but recently obtained medical insurance through her husband. (Tr. 61.)

Plaintiff testified that her current impairments are related to injuries she sustained in an automobile accident in 2005, and specifically, broken ribs, a collapsed lung, broken nose, torn spleen, and broken bones in the back. (Tr. 71-

72.)  Plaintiff testified that she currently has breathing issues but receives no treatment.  (Tr. 72-73.)

Plaintiff testified that she has severe and constant pain between her shoulder blades and in her lower back.  Plaintiff testified that the pain is unbearable and that she has had such pain since 2005.  (Tr. 64.)  Plaintiff testified that she continues to take Oxycodone, Xanax, and Flexeril and has never had an MRI or treatment from an orthopedic surgeon or neurologist.  (Tr. 61.)  Plaintiff testified that she experiences no side effects from her medications.  (Tr. 65.)

Plaintiff testified that she also continues to have headaches two or three times a week, and that such headaches last from thirty minutes to eight hours.  Plaintiff testified that she takes pain medication for the headaches and lies down or sits in a dark room.  Plaintiff testified that she has experienced these headaches since 2005.  (Tr. 62-63.)

Plaintiff testified that she has seen her treating physician, Dr. Beckert, since she was twenty-five years of age and currently sees him once a month.  (Tr. 71.)

As to her exertional abilities, plaintiff testified that she is "up and down" all day and usually needs to keep moving.  Plaintiff testified that she can sit for about twenty minutes at one time and can sit for a total of four hours in an eight-hour day.  Likewise, plaintiff testified that she can stand for about twenty minutes at one time and can stand for a total of four hours in an eight-hour day.  (Tr. 67-68.)

Plaintiff testified that she must alternate positions between sitting and standing. Plaintiff testified that she can walk a couple of blocks. Plaintiff testified that she can lift about five pounds. Plaintiff testified that she cannot bend, stoop, or squat without pain. (Tr. 68-69.)

As to her daily activities, plaintiff testified that she tries to do housework to the extent she can but does not lift heavy loads of laundry or sacks of dog food as she used to. (Tr. 66.) Plaintiff testified that she tries to keep the house clean by picking up, doing the dishes, and other everyday "normal stuff." (Tr. 74.) Plaintiff testified that her husband and other family members help her. Plaintiff testified that she otherwise tries to relax throughout the day. (Tr. 66-67.) Plaintiff testified that she has interrupted sleep because of her back pain, and that her energy level has decreased. Plaintiff testified that she takes afternoon naps a couple of times a week. (Tr. 64-66.)

2.     *Testimony of Vocational Expert*

Dr. John F. McGowan, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Dr. McGowan classified plaintiff's past work as a nurse's aide as medium and semi-skilled; as a fast food worker as light and having an SVP level of 2; as a cook as light to medium and having an SVP level of 3; as a food service worker /dietary aide and sales clerk/retail worker as light and having an SVP level of 3;

and as a machine operator as medium and having an SVP level of 3. (Tr. 77-78.)

The ALJ asked Dr. McGowan to assume an individual under the age of 50 with a twelfth grade education and plaintiff's past work history. The ALJ further asked Dr. McGowan to assume that the person was able to lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for a total of six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; and would need to change positions for a minute or two every hour. (Tr. 79-80.) The ALJ asked Dr. McGowan to further assume the individual to be limited to "[n]o ladders, ropes or scaffolds; occasionally balancing, kneeling, stooping, crouching and crawling; no concentrated exposure to extreme heat or extreme cold or extreme humidity. . . . No whole body vibration." (Tr. 80.) Dr. McGowan testified that such a person could perform some of plaintiff's past work as a machine operator. (Tr. 80-81.) Dr. McGowan testified that such a person could also perform work as a wire wrapping machine operator, with 4,500 such jobs existing in the State of Missouri and 90,000 nationally. (Tr. 83.)

The ALJ then asked Dr. McGowan to assume the same individual but that the individual was limited to a total of four hours of standing/walking in an eight-hour day and a total of four hours sitting in an eight-hour day. Dr. McGowan testified that such a person could perform work as a hospital products assembler, of which 1,500 such jobs exist in the State of Missouri and 26,400 nationally; and a

shrink wrap operator, of which 1,000 such jobs exist in the State of Missouri and 31,200 nationally.  (Tr. 83-84.)

The ALJ then asked Dr. McGowan to assume the person needed to change position for a minute or two every twenty minutes.  Dr. McGowan testified that whether such a person could perform work depended upon the employee's relationship with her supervisor and whether they were a good and fast worker. (Tr. 84-85.)

Finally, the ALJ asked Dr. McGowan to assume the person to be able to occasionally lift a maximum of ten pounds; sit for a total of six hours in an eight-hour day; stand and walk for a total of two hours in an eight-hour day; and be limited to "no ladders, ropes or scaffolds; occasional balance, kneel, crouch, crawl, stoop; no concentrated exposure to extreme heat, cold or humidity; no whole-body vibration and no concentrated exposure to pulmonary irritants."  (Tr. 85.)[3]  The ALJ asked Dr. McGowan to also assume that the person would have to change positions for a minute or two every hour.  (Tr. 86.)  Dr. McGowan testified that such a person could perform work as an electronics assembler, of which 5,000 such jobs exist in the State of Missouri and 472,800 nationally; optical goods assembler, of which 1,160 such jobs exist in the State of Missouri and 68,600 nationally; and

---

[3] Dr. McGowan testified that adding the "pulmonary irritants" restriction to the first few hypotheticals would not change his answers given in response thereto.  (Tr. 85-86.)

photo finisher, of which 1,690 such jobs exist in the State of Missouri and 144,000 nationally.  Dr. McGowan testified that a person would be unable to perform such work if she was limited to occasional pushing, pulling, and reaching.  (Tr. 87-88.) Dr. McGowan testified that the jobs identified would limit a person to one missed day of work every month.  (Tr. 88-89.)

### III.  Medical Evidence Before the ALJ

Plaintiff visited Dr. J. Beckert, D.O., on November 28, 2005, with complaints of pain related to cystitis.  Plaintiff was given an antibiotic.  (Tr. 610.)

In January 2006, plaintiff was diagnosed as having a kidney infection as diagnosed by urinalysis and back pain.  Plaintiff developed pelvic pain in February 2006 for which she was prescribed Darvocet, which proved to be ineffective.  It was ultimately determined that plaintiff suffered recurrent pelvic inflammatory disease.  (Tr. 595-611.)

On May 1, 2006, Dr. Beckert prescribed Darvocet for plaintiff.  (Tr. 594.)

Plaintiff visited Dr. Beckert on May 30, 2006, with complaints related to tracheobronchitis and pharyngitis.  No other complaints were noted.  (Tr. 591.)

On August 29, 2006, plaintiff was prescribed Darvocet.  (Tr. 591.)

Plaintiff visited Dr. Beckert on September 9, 2006, with complaints related to tracheobronchitis and pharyngitis.  No other complaints were noted.  (Tr. 591.)

Plaintiff visited Dr. Matthew Cormier, D.O., on January 4, 2007, with

complaints of chronic back pain after having been involved in a motor vehicle accident in February 2005. Plaintiff reported that Darvocet did not help as much as Percocet or Roxicet, which she had obtained from her mother. Tenderness to palpation was noted about the thoracic spine. The lumbar spine was noted to be bent to the side at L3, L4, and L5. Dr. Cormier diagnosed plaintiff with chronic pain and somatic dysfunction of the thoracic and lumbar areas. Soft tissue and high-velocity/low amplitude thrusts were performed to the thoracic and lumbar areas. Plaintiff was prescribed Cymbalta and was started on a trial of Skelaxin. (Tr. 590.)

X-rays taken of the thoracic and lumbar spine on January 6, 2007, in response to plaintiff's complaints of chronic upper and low back pain showed minimal reduction in vertebral height at T8 or T9, mild spondylosis of the mid and lower thoracic spine and lower lumbar spine, and no definite sign of acute fracture. (Tr. 525.)

Plaintiff visited Dr. Beckert on June 19, 2007, who noted plaintiff to have been in a severe motor vehicle accident in February 2005 and that she currently experienced significant pain and discomfort involving her back. Dr. Beckert arranged for plaintiff to have an orthopedic consultation. Hydrocodone was prescribed. (Tr. 589.)

On September 4, 2007, plaintiff complained to Dr. Beckert that she

continued to have a lot of pain. Plaintiff reported that Percocet worked better than Hydrocodone, and Dr. Beckert prescribed Percocet.[4] Dr. Beckert determined to continue plaintiff on the current program and advised plaintiff that she may need to see an orthopedist if her condition did not improve. Plaintiff's prognosis was noted to be guarded. (Tr. 589.)

Chest x-rays taken September 13, 2007, in response to plaintiff's complaints of rib pain and left-sided pain showed prior multiple left rib trauma, healed; no acute rib fractures; and no acute cardiopulmonary disease. (Tr. 527.)

Plaintiff visited Dr. Beckert on September 14, 2007, with complaints of significant pain and discomfort in her back. Osteopathic manipulative treatment (OMT) was administered to the dorsal and cervical lumbar area with fair results. An injection of Decadron/Medrol was also administered, and plaintiff was prescribed Motrin for discomfort. (Tr. 535.)

On February 4, 2008, Dr. Beckert refilled a Percocet prescription for plaintiff's chronic back pain. Dr. Beckert noted plaintiff's condition to be stable and satisfactory. Plaintiff was instructed to follow up regularly. (Tr. 537.)

Plaintiff returned to Dr. Beckert on March 18, 2008, with complaints

---

[4] With her Brief in Support of the Complaint, plaintiff attached a pharmaceutical description of Percocet setting out that the medication contains a combination of acetaminophen and Oxycodone. (*See* Pltf.'s Brief, Doc. #14 at pp. 22-25.) Plaintiff submits this information to support her argument that she was regularly taking Percocet as demonstrated by her prescription records. (*Id.* at p. 9; Tr. 499-511, 513.)

relating to allergies. On March 24, plaintiff visited Dr. Beckert with complaints related to tracheobronchitis and pharyngitis. (Tr. 536.)

Plaintiff visited Dr. Beckert on August 29, 2008, who noted plaintiff to have persistent, unrelenting back pain. Dr. Beckert noted plaintiff to take Oxycodone on an intermittent basis for the pain and in fact did not take the medication very often. A refill of the medication was given. Dr. Beckert also noted plaintiff to have some anger management problems in that she becomes easily upset. Xanax was prescribed. (Tr. 534.)

On November 3, 2008, plaintiff underwent OMT with Dr. Beckert with satisfactory results. Plaintiff left the office in stable condition. Plaintiff was diagnosed with acute somatic dysfunction, and her prescriptions for Oxycodone and Xanax were refilled. (Tr. 534.)

Plaintiff was admitted to the emergency room at Keokuk Area Hospital on December 3, 2008, after being involved in a motor vehicle accident. Plaintiff's history of depression and previous involvement in a motor vehicle accident in 2005 was noted. Plaintiff was treated for a contusion to the left shin and was released. (Tr. 552-55.)

Plaintiff followed up with Dr. Beckert on December 8, 2008, and reported having pain and discomfort involving the dorsal and cervical area from the recent accident. Plaintiff reported continued muscle soreness and tenderness but denied

any current significant pain.  Plaintiff requested a muscle relaxer and was prescribed Flexeril.  (Tr. 563, 581.)  On December 23, plaintiff's prescriptions for Oxycodone, Flexeril, and Xanax were refilled.  (Tr. 563.)

Plaintiff was admitted to the emergency room at Keokuk Area Hospital on February 3, 2009, with complaints of having increased back pain since the December 2008 accident.  Examination showed muscle spasm about the back. Plaintiff showed no guarding of the back at any time.  CT scans of the lumbosacral and thoracic spine showed minor arthritic or degenerative changes with minor dextrocurvature.  Plaintiff was diagnosed with chronic low to mid back pain, was given ibuprofen, and was instructed to follow up with her family practitioner or with an orthopedist.  (Tr. 556-60, 564-79.)

Plaintiff returned to Dr. Beckert on August 4, 2009, for a disability physical and for medication refills.  In his treatment note, Dr. Beckert wrote:

> We did a physical exam today, my clinical impression is that the patient's overall condition has continued to deteriorate.  I feel that in all likelihood her condition will not improve, she has had this condition since 2005 basically from her MVA and has not improved. My clinical impression #1:  She is not going to improve, has had consultations in the past and I feel the disability will continue for an indefinite period of time and I feel [that] she is not going to improve.

(Tr. 563.)  Plaintiff's prescriptions for Oxycodone, Xanax, and Flexeril were refilled that same date.  (*Id.*)

On August 5, 2009, Dr. Beckert completed a Medical Source Statement

(MSS) in which he opined that plaintiff could occasionally lift and carry ten pounds and frequently lift and carry less than ten pounds; stand and/or walk for a total of less than two hours in an eight-hour workday; must periodically alternate between sitting and standing to relieve pain or discomfort; and was limited in pushing and/or pulling with her upper extremities. Dr. Beckert further opined that plaintiff could frequently climb, balance, kneel, crouch, and crawl, and could occasionally stoop. Dr. Beckert further opined that plaintiff was limited in her ability to reach in all directions. Finally, Dr. Beckert opined that plaintiff had environmental limitations with humidity/wetness, hazards, fumes, odors, chemicals, and gases; but had no limitations with temperature extremes, noise, dust, or vibration. Although asked, Dr. Beckert did not provide any medical or clinical findings to support these conclusions. Dr. Beckert reported that plaintiff began experiencing these limitations on February 20, 2005. (Tr. 629-32.)

Plaintiff returned to Dr. Beckert on January 5, 2010, who noted plaintiff to continue to have persistent chronic back pain. Plaintiff reported that she does not take her pain medication with any degree of regularity and that she only takes it "when she has to." Dr. Beckert noted plaintiff to be doing fairly well. It was again discussed that plaintiff may possibly need a back consultation, but it was noted that plaintiff could not afford a consultation because of lack of insurance. Plaintiff's prescriptions for Oxycodone, Xanax, and Flexeril were refilled. (Tr. 652.)

On February 5, 2010, Dr. Beckert noted plaintiff to continue to be doing fairly well. Dr. Beckert advised plaintiff not to take more than four Oxycodone a day. Dr. Beckert advised plaintiff to seek further consultation and an MRI for her back pain as soon as she has insurance. Plaintiff's medications were refilled. (Tr. 652.) Plaintiff's medications were refilled again on March 8. (Tr. 651.)

Plaintiff visited Dr. Beckert on April 9, 2010, who noted plaintiff's overall condition to remain essentially unchanged with continued complaints of back pain and discomfort as well as generalized anxiety. Plaintiff's medications were refilled. (Tr. 700.)

Plaintiff returned to Dr. Beckert on May 7, 2010, with continued complaints. Dr. Beckert determined to continue plaintiff on the current management program and noted specifically that he would not increase the dosage of pain medication given plaintiff's age and that she was taking enough narcotic pain medication. Dr. Beckert stated that "if anything we may consider reducing the dose." Plaintiff's medications were refilled. (Tr. 699.)

On May 10, 2010, Dr. Paula Kresser, a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which she opined that plaintiff's anxiety impairment was not severe and caused no functional limitations. (Tr. 664-74.)

On May 11, 2010, plaintiff underwent a consultative physical examination

for disability determinations for her reported complaints of back pain, allergies, and anger/anxiety.  (Tr. 676-83.)  Dr. Gregory Henry noted plaintiff to be pleasant and in "absolutely no distress."  (Tr. 679.)  Plaintiff reported that she was able to complete activities of daily living but that she had a persistent ache in her back that required the regular use of narcotics, muscle relaxers, and anti-anger medications. Examination showed plaintiff to be cooperative and to have a normal affect. Plaintiff's upper extremities were symmetric and showed no atrophy.  Plaintiff had full grip strength and upper extremity strength.  No weakness was noted about the lower extremities.  No neuromuscular deficits were noted.  No restriction or compromise in joint motion was noted.  Plaintiff's seated posture was noted to be normal.  Plaintiff had limited range of motion with extension of the lumbar spine. Slight limitation of motion was noted with flexion and extension of the cervical spine.  Dr. Henry concluded that plaintiff had a normal physical examination without absolute objective findings, and that plaintiff demonstrated normal capabilities throughout.  (Tr. 676-83.)  Dr. Henry opined that plaintiff "demonstrates the ability to perform work-related functions involving sitting, standing, walking, lifting, carrying, and handling objects without significant impairment. . . . Based on observation, I would see no contraindication to working minimally in the light to low-medium demand range."  (Tr. 680.)

On June 9, 2010, Dr. Beckert refilled plaintiff's prescriptions for

Oxycodone, Xanax, and Flexeril, noting plaintiff to be doing fairly well and to be at least in stable condition. Plaintiff's prognosis was noted to be guarded. (Tr. 698-99.) On July 9, Dr. Beckert noted plaintiff to be stable and satisfactory. Plaintiff was continued on her current treatment regimen. (Tr. 698.) On August 6, Dr. Beckert refilled plaintiff's medications but noted the possibility of reducing the dosage of Percocet. (Tr. 697-98.) On September 13, Dr. Beckert noted plaintiff's overall condition to be essentially unchanged. (Tr. 697.)

Plaintiff returned to Dr. Beckert on January 15, 2011, who noted her overall condition to be stable and satisfactory. Dr. Beckert discussed the possibility of referring plaintiff to the University of Missouri for assessment of her back condition. Dr. Beckert reported that "whether or not there will be any further change is difficult to determine." (Tr. 696.) Plaintiff's medications were refilled. (Tr. 697.) Plaintiff's medications were again refilled on February 11 and March 11. (Tr. 694-95.)

Plaintiff returned to Dr. Beckert on April 11, 2011, who noted plaintiff to have been evaluated and determined not to be a surgical candidate, and that plaintiff's condition would be managed conservatively. On May 16, Dr. Beckert noted plaintiff's overall condition to be satisfactory and stable, although plaintiff complained of a lot of headaches and of chronic neck and back pain. Dr. Beckert refilled plaintiff's medications. (Tr. 693.) On June 24, Dr. Beckert noted that

plaintiff would continue on her current treatment regimen.  (Tr. 692.)

On July 22, 2011, Dr. Beckert's office advised counsel that there had been no change and no improvement in plaintiff's condition since Dr. Beckert completed the MSS in August 2009.  (Tr. 685.)

Between July 30 and November 29, 2011, plaintiff visited Dr. Beckert on five occasions for medication refills.  On each occasion, plaintiff's condition was noted to be stable and Dr. Beckert continued plaintiff on the same treatment regimen.  (Tr. 709-10, 712.)

## IV.  Third Party Correspondence

On January 26, 2009, Sherry L. Baxter, plaintiff's mother, wrote to the SSA and reported that plaintiff cannot work because of her back condition.  Ms. Baxter wrote that plaintiff is constantly in pain and that she had observed plaintiff cry out in pain when trying to brush her hair.  Ms. Baxter reported that plaintiff cannot walk too far or sit or stand very long because of her pain.  Ms. Baxter reported that plaintiff can lift three to five pounds.  Ms. Baxter reported that plaintiff cannot reach up, lie down, or stand to pull up her pants because of her pain.  Ms. Baxter reported that plaintiff is not rude or mean but is always stressed because she cannot do what she wants.  (Tr. 411-13.)

On January 27, 2009, Amber Leinhart, plaintiff's sister-in-law, wrote to the SSA and reported that plaintiff cannot work because her back does not stay in

place and her broken ribs will not heal.  Ms. Leinhart reported that plaintiff cannot move around or lie down when she is in pain.  Ms. Leinhart reported that plaintiff can walk for an hour or less, and can sit or stand for thirty minutes or less.  Ms. Leinhart reported that plaintiff can lift five pounds with one hand and ten pounds with both hands.  Ms. Leinhart reported that plaintiff has difficulty reaching above her shoulder to brush and/or clean her hair.  Ms. Leinhart reported that plaintiff cannot do household chores such as washing dishes, sweeping, vacuuming, or reaching to dust because of the pain associated with her condition.  Ms. Leinhart reported that she has never observed plaintiff to interact inappropriately with the public.  Ms. Leinhart reported plaintiff to be stressed since she can no longer do many things.  Ms. Leinhart reported that plaintiff sometimes has difficulty remembering instructions because she is preoccupied with her pain.  (Tr. 415-17.)

On March 26, 2010, Brian Hageman, plaintiff's husband, completed a Third Party Function Report for the SSA in which he reported that plaintiff does as little as possible throughout the day.  Mr. Hageman reported that plaintiff has difficulty bending, which results in her having trouble with bathing and getting dressed.  Mr. Hageman reported that plaintiff prepares meals that consist primarily of frozen pizza or frozen dinners.  Mr. Hageman reported that plaintiff does some cleaning, laundry, and dishes but needs to take breaks.  Mr. Hageman reported that plaintiff drives and can go out alone.  Mr. Hageman also reported that plaintiff shops in

stores, but that it takes hours for her to do so.  Mr. Hageman reported that he

usually does the shopping.  Mr. Hageman reported that plaintiff watches television,

visits with people daily, and has no problems getting along with others.  Mr.

Hageman reported that plaintiff's condition affects her ability to lift, sit, climb

stairs, squat, kneel, bend, stand, reach, and walk.  Mr. Hageman reported that

plaintiff can walk one block and needs to rest for twenty minutes before resuming.

Mr. Hageman reported that plaintiff can pay attention for a long time, complete

tasks, and follow written and spoken instructions very well.  Mr. Hageman

reported that plaintiff handles stress well, as well as changes in routine.  (Tr. 457-

64.)

## V.  The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social

Security Act through December 31, 2013.  The ALJ found plaintiff not to have

engaged in substantial gainful activity since August 6, 2008, the alleged onset date

of disability.  The ALJ found plaintiff's degenerative disc disease of the thoracic

and lumbar spine, somatic dysfunction, and history of collapsed lung to be severe

impairments, but that such impairments, either singly or in combination, did not

meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (Tr. 11-14.)  The ALJ found plaintiff to have the RFC to perform

light work, except that she

needs to change position for 1-2 minutes every hour. She is unable to climb ladders, ropes, and scaffolds. She must avoid concentrated exposure to extremes of heat, cold, or humidity as well as concentrated exposure to pulmonary irritants and whole body vibration. She can only occasionally balance, stoop, kneel, crouch, and crawl.

(Tr. 14.) The ALJ determined that plaintiff was unable to perform any past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that vocational expert testimony supported a finding that plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, wire wrap machine operator, hospital products assembler, and shrink wrap operator. The ALJ thus found plaintiff not to be under a disability from August 6, 2008, through the date of the decision. (Tr. 18-20.)

## VI. Discussion

To be eligible for DIB under the Social Security Act, plaintiff must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if [her]

physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

      6.     The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

A.    <u>Cross-Examination of Consulting Physician</u>

     Plaintiff underwent a consultative physical examination for disability determinations in May 2010. At the October 2011 administrative hearing, plaintiff testified that the consulting physician, Dr. Henry, did not physically touch her back at any point during the examination. (Tr. 70-71.) Counsel requested that he be permitted to cross-examine Dr. Henry, and such request was heard by the ALJ at a

supplemental hearing on February 8, 2012. (Tr. 27-46.) Prior to this supplemental

hearing, counsel requested that the ALJ issue a subpoena to secure Dr. Henry's

presence at the hearing. (*See* Pltf.'s Brief, Doc. #14 at pp. 17-18.) In his written

decision, the ALJ stated that there was no basis to subpoena Dr. Henry for cross-

examination:

> Basically, counsel argues, and had claimant testify, that Dr. Henry
> refused to examine and palpate her back. However, Dr. Henry does
> not say in his report that he did. Accordingly, there is no dispute of
> fact that needs to be resolved. Counsel argues that Dr. Henry should
> have palpated claimant's back to test for spasm, etc. However, the
> important fact is that he apparently did not because he obviously
> believed in his professional opinion that there was no medical need to
> do so. Because there is no reason to believe that he would testify
> otherwise, there is little point in issuing a subpoena so that counsel
> can argue a point with Dr. Henry that is not in question. More
> importantly, none of this highlights any facts that the witness is
> expected to prove. That is, counsel is arguing Dr. Henry should have
> palpated the claimant's spine, but he did not, so he would not be able
> to testify about what signs he did and did not see on palpation, and
> thus there are no facts that he would be expected to prove beyond
> what he already put in his report.

(Tr. 18.) Plaintiff contends here that the ALJ failed in his duty to fully and fairly

develop the record by not allowing her the opportunity to cross-examine Dr.

Henry. Plaintiff argues that such cross-examination was necessary given that Dr.

Henry's conclusion that plaintiff experienced little or no limitations – reached after

his one-time examination that involved no physical contact with plaintiff's back –

was in stark contrast to the opinion of plaintiff's treating physician who had

examined her on a regular basis. Plaintiff contends that Dr. Henry's motivation and bias in reaching his conclusions were relevant and thus provided a proper basis for cross-examination.

Procedural due process requires disability claimants to be afforded a full and fair hearing. *Hurd v. Astrue*, 621 F.3d 734, 739 (8th Cir. 2010). Due process does not, however, "afford social security claimants an absolute right to cross-examine individuals who submit a report." *Passmore v. Astrue*, 533 F.3d 658, 665 (8th Cir. 2008). Instead, the right to subpoena and cross-examine stems from the agency's regulations, which provides the ALJ discretion to issue a subpoena when reasonably necessary for the full presentation of a case. *Id.* at 661-62 (citing *Richardson v. Perales*, 402 U.S. 389 (1971); 20 C.F.R. § 404.950(d)(1)). For the following reasons, the ALJ did not abuse his discretion here in determining not to subpoena Dr. Henry for purposes of allowing plaintiff to cross-examine him.

As noted by the ALJ, there were no factual discrepancies or issues that cross-examination would have resolved or proven given that there was no dispute in the testimonial or medical evidence of record that Dr. Henry did not palpate plaintiff's back. 20 C.F.R. § 404.950(d)(2) (parties who wish to subpoena witness must state the important facts that the witness is expected to prove); *see also Passamore,* 533 F.3d at 666 (ALJ did not abuse discretion because claimant failed to identify important facts that witness was expected to prove or explain why facts

could not be proved without subpoena and cross-examination).

To the extent plaintiff argues that cross-examination would have disclosed Dr. Henry's bias or motivation to not conduct a full physical exam, the undersigned notes that plaintiff failed to avail herself of the opportunity to challenge Dr. Henry's objectivity prior to the examination, as provided by the Regulations. *See* 20 C.F.R. § 404.1519j (Commissioner will review claimant's objection that consultative medical source designated by the Commissioner lacks objectivity). In such circumstances, the Eighth Circuit has held that an ALJ does not abuse his discretion by denying a claimant's request to cross-examine the consulting physician. *See Passmore*, 533 F.3d at 666 (citing *Hepp v. Astrue*, 511 F.3d 798, 805 (8th Cir. 2008)). This is especially significant here, where plaintiff's counsel expressed trepidation at the September 2009 hearing regarding the Commissioner's potential selection of a consulting physician:

> ATTY:      Your Honor, can I make a suggestion before I question the witness? Given your - - and your understandable concern about the physical evidence, I think it would [be] appropriate for me to request an orthopedic CE. They actually - - the State - - they've got two groups they send people to. There's Medex in St. Louis, and then there's the Columbia Orthopaedic Group in Columbia.
>
> To be honest with you, Columbia Orthopaedic Group in Columbia has never seen a disabled person in their lives, but Medex really does do a fair, balanced job. I mean, they don't - - again, they're not shills.

(Tr. 106.) In addition, the record shows counsel to have had concerns regarding

the objectivity of Dr. Henry specifically, as expressed in an October 2011 letter to the ALJ wherein counsel cites Dr. Henry's reputation of rendering opinions unfavorable to injured persons.  (Tr. 495-96.)

Because plaintiff did not challenge the objectivity of the consulting physician prior to her examination–despite counsel's concerns relating thereto, and failed to identify important facts that would be proven by cross-examining Dr. Henry, she has failed to establish that her cross-examination of Dr. Henry was reasonably necessary for the full presentation of her case.  The ALJ therefore did not abuse his discretion by failing to subpoena Dr. Henry and provide plaintiff an opportunity to cross-examine him.  *Passmore*, 533 F.3d at 666.

B.     <u>Weight Accorded to Dr. Beckert's Opinion</u>

In his written decision, the ALJ accorded some weight to Dr. Beckert's opinion expressed in his August 2009 MSS and as reaffirmed in his July 2011 statement.  Plaintiff contends that Dr. Beckert's opinion is entitled to controlling weight inasmuch as there is no contradictory evidence in the record and the opinion satisfies the factors to be considered in determining the weight accorded to medical opinions.  For the following reasons, the ALJ did not err in his consideration of Dr. Beckert's opinion.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating

sources, and non-examining sources.  *See* 20 C.F.R. § 404.1527(e)(2)(ii).  The

Regulations require that more weight be given to the opinions of treating

physicians than other sources.  20 C.F.R. § 404.1527(c)(2).  A treating physician's

assessment of the nature and severity of a claimant's impairments should be given

controlling weight if the opinion is well supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with other substantial

evidence in the record.  *Id.; see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th

Cir. 2004).  This is so because a treating physician has the best opportunity to

observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most
> able to provide a detailed, longitudinal picture of [a claimant's]
> medical impairment(s) and may bring a unique perspective to the
> medical evidence that cannot be obtained from the objective medical
> findings alone or from reports of individual examinations, such as
> consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2).

When a treating physician's opinion is not given controlling weight, the

Commissioner must look to various factors in determining what weight to accord

the opinion.  20 C.F.R. § 404.1527(c)(2).  Such factors include the length of the

treatment relationship and the frequency of examination, the nature and extent of

the treatment relationship, whether the treating physician provides support for his

findings, whether other evidence in the record is consistent with the treating

physician's findings, and the treating physician's area of specialty. *Id.* The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." *Id.*

Here, the reasons given by the ALJ to accord Dr. Beckert's opinion less than controlling weight are supported by substantial evidence on the record as a whole. As such, the Court defers to the ALJ's determination.

First, the ALJ noted that Dr. Beckert's opinion that plaintiff was limited to standing or walking for a total of two hours in an eight-hour workday was contrary to plaintiff's testimony. Indeed, plaintiff testified that she could engage in such activity for a total of four hours. *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (ALJ properly discounted treating physician's opinion where claimant testified that she regularly engaged in activities that exceeded opined limitations); *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005) (substantial evidence supported ALJ's decision to discount treating physician's opinion given that claimant's actual behavior was clearly at odds with limitations described by the medical source). *Cf. Baldwin v. Barnhart*, 349 F.3d 549, 557 (2003) (exertional restrictions in RFC consistent with claimant's testimony as to such). The ALJ also noted that Dr. Beckert's opinion that plaintiff was limited in her ability to reach, push, and pull enjoyed no support in the medical records and, further, that no

medical reason was given for this limitation.  *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (where limitations set out in a treating physician's assessment "stand alone" and were "never mentioned in [the physician's] numerous records or treatment" nor supported by "any objective testing or reasoning," ALJ's decision to discount treating physician's statement is not error).  See also 20 C.F.R. § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

The ALJ also noted that Dr. Beckert's statement that plaintiff's condition continued to deteriorate and would never improve was inconsistent with his treatment notes that repeatedly showed plaintiff's condition to be stable and required no change to her medication or treatment regimen.  In addition, the record shows Dr. Beckert to have in fact considered a reduction in the dosage of plaintiff's pain medication, to have repeatedly found plaintiff's condition to be "satisfactory," and to have noted plaintiff not to regularly take her pain medication. In view of this contrary evidence from Dr.  Beckert's own treatment notes, the ALJ did not err in discounting Dr. Beckert's statement that plaintiff's condition was deteriorating.  *See Owen v. Astrue*, 551 F.3d 792, 799 (8th Cir. 2008).

A review of the ALJ's decision shows him to have evaluated all of the evidence of record and to have provided good reasons for the weight he accorded Dr. Beckert's opinion.  For the reasons set out above, substantial evidence on the

record as whole supports the ALJ's determination as to the weight he accorded Dr.

Beckert's opinion in this case and the Court will not disturb the determination.

C.    Consideration of Somatic Dysfunction

Plaintiff claims that, despite finding plaintiff's somatic dysfunction to be a

severe impairment, the ALJ failed to include in the RFC assessment any functional

limitations caused thereby.  Plaintiff claims that the ALJ erred by failing to

properly consider this "nonexertional mental impairment" as demonstrated by his

failure to evaluate this mental impairment under Listing § 12.07, which governs

somatoform disorders.  (Pltf.'s Brief, Doc. #14 at pp. 11-12.)  For the following

reasons, plaintiff's argument is misplaced.

"Somatic dysfunction" is a term of art used in the field of osteopathy and is

defined as the "[i]mpaired or altered function of related components of the somatic

(body framework) system:  skeletal, arthrodial and myofascial structures, and their

related vascular, lymphatic, and neural elements."  American Ass'n of Colleges of

Osteopathic Med. (AACOM), *Glossary of Osteopathic Terminology* 53 (rev. Nov.

2011).  "Somatic dysfunction is treatable using osteopathic manipulative

treatment."  *Id.*  In contrast, somatoform disorder is a mental impairment whereby

an individual experiences "[p]hysical symptoms for which there are no

demonstrable organic findings or known physiological mechanisms."  20 C.F.R.

Part 404, Subpart P, Appendix 1, § 12.07.

Here, plaintiff's treating physician, a doctor of osteopathy, diagnosed plaintiff with "somatic dysfunction" and treated her with osteopathic manipulative treatment. There is no evidence in the record that plaintiff was ever diagnosed with somatoform disorder or was suspected of suffering from this mental impairment. Accordingly, the ALJ did not err by failing to include in his RFC assessment any limitations caused by a mental impairment from which plaintiff did not suffer. Instead, a review of the RFC assessment shows the ALJ to have included significant exertional and non-exertional limitations attributed to plaintiff's pain that she experienced as a result of her severe impairments, including the physical impairment of somatic dysfunction.

D.    Third-Party Statements

In his written decision, the ALJ acknowledged the statements written by plaintiff's mother and sister-in-law and determined to accord them little weight inasmuch as they were lay opinions and described limitations that were inconsistent with the medical evidence of record. (Tr. 18.) Because these reasons are supported by substantial evidence on the record as a whole, they cannot be disturbed. *Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996) (ALJ properly discounted third party statements that conflicted with medical evidence and were given by persons not qualified to render an opinion on capacity to work). Although the ALJ did not specifically address Mr. Hageman's Third Party

Function Report, a review of the report shows the statements therein to primarily be a recitation of plaintiff's subjective allegations, which the ALJ found not to be credible. Where an ALJ properly discredits a claimant's complaints of disabling symptoms, he is equally empowered to reject the cumulative testimony of the claimant's relatives and acquaintances. *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998) (citing *Ostronski*, 94 F.3d at 419). For the following reasons, the ALJ properly rejected plaintiff's subjective complaints and therefore had a proper basis upon which to likewise reject Mr. Hageman's statements.

First, the ALJ noted the medical evidence of record not to support plaintiff's complaints of disabling pain, specifically noting the diagnostic testing to show only mild or minor conditions. *See Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008) (diagnosis tempered by the words "mild" or "minimal"). The ALJ also noted that plaintiff did not take her pain medication regularly and only when she had to. Taking pain medication only as needed "could create doubt in a reasonable adjudicator's mind with regard to [a claimant's] testimony about the extent of her pain." *Curran-Kicksey v. Barnhart*, 315 F.3d 964, 969 (8th Cir. 2003). The ALJ also noted that Dr. Beckert repeatedly observed plaintiff's condition to be stable and that he initiated very few changes to her treatment regimen, if any, and indeed considered lowering plaintiff's dosage of pain medication. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (impairments that are controllable or amenable to

treatment do not support a finding of disability). The ALJ also noted that, despite plaintiff's claim that she had experienced her disabling symptoms since 2005, she continued to work with such symptoms, no medical evidence showed that her condition worsened at the time she stopped working, and she did not seek regular treatment for her disabling condition until 2010. *E.g.*, *Goff,* 421 F.3d at 792-93 (fact that claimant worked with impairment relevant to credibility determination); *Brockman v. Sullivan*, 987 F.2d 1344, 1347 (8th Cir. 1993) (not seeking regular treatment inconsistent with complaints of disabling pain). In addition, the ALJ noted that plaintiff's treatment consisted only of routine office visits with her primary care physician for medication refills with no treatment provided by a specialist. *See Black,* 143 F.3d at 386-87 (conservative course of treatment inconsistent with complaints of debilitating pain).

A review of the ALJ's decision shows that, in a manner consistent with and as required by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from her credibility. Because these same inconsistencies discredit the statements made by the lay witnesses proffered by plaintiff, the ALJ did not err in rejecting these third party statements. *Black*, 143 F.3d at 387. The failure to refer specifically to the statements made by plaintiff's husband does not alter this result. *Cf. Lorenzen v.*

*Chater*, 71 F.3d 316, 318 (8th Cir. 1995) (failure to cite specific reasons to discredit third party statement not error where such statement would be discredited by the same evidence that discredited claimant's own testimony).  An arguable deficiency in opinion-writing technique does not require an ALJ's finding to be set aside when the deficiency has no bearing on the outcome.  *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008).

Accordingly, because the ALJ's credibility determination is supported by good reasons and substantial evidence, it is entitled to deference by this Court. *Goff,* 421 F.3d at 793; *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).

## VII.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination that plaintiff was not disabled from August 6, 2008, through the date of the decision is supported by substantial evidence on the record as a whole, and plaintiff's claims of error should be denied.  Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001); *see also Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011).

Therefore,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


/s/Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE


Dated this 30th day of September, 2014.